FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
NOV 0 6 2008
JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## WESTERN DIVISION

COPART, INC.                                                    PLAINTIFF

v.                          Case No. *4:08CV004127 JLH*

JASON WALSH                                                    DEFENDANT

**COMPLAINT** This case assigned to District Judge *Holmes*
and to Magistrate Judge *Kay*

Plaintiff Copart, Inc. brings this suit against its former employee, Defendant Jason Walsh,

for unfair competition and would show the Court as follows:

## PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff Copart, Inc. ("Copart") is a California corporation with its principal place

of business located in Fairfield, California. Thus, Copart is a citizen of the state of California.

2.      Defendant Jason Walsh ("Walsh") is an individual who resides in Faulkner

County, Arkansas. Upon information and belief, Walsh is a citizen of the state of Arkansas.

3.      This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332

because the parties are citizens of different states and the amount in controversy exceeds

$75,000, exclusive of interest and costs.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391 because

Walsh resides in this district and/or a substantial part of the events or omissions giving rise to the

claim occurred within this district.

## FACTUAL ALLEGATIONS

5.      Copart is a leading online re-marketer of vehicles, selling more than 1 million vehicles per year in an auction-style format.  It provides vehicle suppliers[1] with a full range of remarketing services to expose their products to buyers in more than 85 countries.  Those buyers include licensed dismantlers, re-builders, used vehicle dealers, and exporters.  Copart generally does not own the vehicles sold through it, rather it acts as an intermediary between sellers and buyers.

6.      Copart provides various remarketing services to process and sell vehicles over the internet through its patented online technology on behalf of vehicle suppliers, which consist primarily of insurance companies, banks and financial institutions, charities, car dealerships, fleet operators, vehicle rental companies, and the general public.

7.      Copart offers vehicle suppliers a full range of services which expedite each stage of the remarketing process and minimize administrative and processing costs.  At the same time, Copart offers buyers fast and convenient ways to find the vehicles they want.

8.      Copart generates revenues primarily from sales fees paid by vehicle suppliers and vehicle buyers, as well as related fees for services such as storage.

9.      One of the reasons for Copart's growth and success is its patented online technology, called VB2, which was introduced in 2003.  VB2 allows buyers from all over the

---

[1] In this Complaint, Plaintiff will use the terms "sellers," "suppliers" or "customers" to refer to its sellers or suppliers.  Individuals, dismantlers, re-builders, used vehicle dealers, exporters, and others who purchase vehicles through Plaintiff's auctions will be referred to as "buyers."

world to bid on vehicles without leaving their office or home. VB2 makes the sales process more efficient; indeed, Copart sells a car every 8 seconds, on average.

10.     Copart hired Defendant on or about March 11, 1996.  In May of 1997, Defendant was promoted to Assistant General Manager and transferred from a Copart facility in Houston, Texas, to Copart's Central Arkansas facility, located at 703 Highway 64 East, Conway, Arkansas 72032.   In September 1998, Defendant was promoted from Assistant General Manager to General Manager of the Conway facility.  Defendant had been employed as the General Manager of Copart's Conway facility for nearly ten years when he suddenly announced his resignation on July 18, 2008, indicating he had accepted a position with a direct competitor, Sapulpa Auto Pool, Inc. ("Sapulpa").

11.     The General Manager is responsible for leading and directing his or her facility's team to achieve revenue, budget, and customer and buyer satisfaction goals by ensuring that company standards of performance are developed and met.  As General Manager, Defendant's job duties included, but were not limited to, the following: (a) managing the operational staff of the facility, (b) executing the company's customer and buyer service commitments, (c) implementing and adhering to company policies, (d) efficiently fulfilling contractual obligations to vehicle suppliers, (e) building relationships with key supplier personnel, (f) developing customer and buyer confidence and goodwill, (g) identifying and correcting any service or policy lapses within the organization, (h) collecting confidential/sensitive information from customers and buyers, and (i) ensuring billing and seller proceeds are timely and accurately handled.

12.     Needless to say, Defendant acquired a great deal of confidential information regarding Copart and its operations during his nearly ten-year stint as its Conway facility manager.  Copart's business model is unique and its business methods are not generally known.

In his position with Copart, Defendant had access to numerous trade secrets, including, but not limited to, the following categories:

(a)     Copart's pricing model and its pricing structure with particular customers;

(b)     The amount of profit that Copart makes on contracts with particular customers;

(c)     Copart's margins of profitability utilized in its pricing model;

(d)     A customer's established auction habits with Copart and the details of their agreements with Copart;

(e)     Copart's methods of doing business, its processes, operations, marketing programs, computer programs, and future plans, including, but not limited to, how Copart handles abandoned vehicles, how Copart handles claim denials, how Copart handles buyer disputes, how Copart bills customers for towing and storage, how Copart handles title processing for customers and buyers; and the enhancements Copart provides for customers and buyers and the pricing for those enhancements;

(f)     Copart's subhauler agreements, including its tow rate structure; and

(g)     Copart's strategic planning for the future and how Copart intends to attack certain markets with specific customers.

13.     Copart has a process for the protection of its trade secrets, confidential information, and customer and buyer goodwill.  As part of this process, employees, such as Defendant, with access to Copart's trade secrets, confidential information, and customer and buyer goodwill are required to sign agreements containing non-compete obligations and customer and employee non-solicitation restrictions.  In addition, all Copart employees are required to acknowledge and agree to Copart's confidentiality policy, which is contained in its Employee Handbook.  Copart also issues passwords to employees who are privy to trade secret information. Copart's insurance company customers are also informed that their contracts are considered confidential.

14.     Defendant signed a non-competition/non-solicitation agreement attached hereto as Exhibit A on March 15, 2001 ("NCNS Agreement"). The NCNS Agreement provides that, for a period of 18 months following his termination, Defendant shall not, within a specified geographic area, compete against Copart concerning any of the following activities:

> (i) auctioning, processing, or selling salvage or used vehicles; (ii) soliciting business from current, former, or potential Copart customers or vehicle suppliers in the business of auctioning, processing, or selling salvage or used vehicles; (iii) promoting or assisting, financially or otherwise, any person or business entity engaged in the business of auctioning, processing, or selling salvage or used vehicles; or (iv) encouraging or soliciting any Copart employees to leave the employment of Copart for any reason.

Ex. A, ¶ 1.

15.     As noted above, Copart protects its confidential information through its written confidentiality policy, published in its Employee Handbook. Although the policy was revised during Defendant's tenure, in general, the policy states that employees are responsible for safeguarding confidential information with which they are entrusted during their employment. The policy also notes that legal action may be taken by Copart if the policy is breached. Further, the policy specifically states that Copart's General Managers are responsible for seeing that the policy is enforced. Defendant, like other Copart employees, acknowledged in writing that he had received the handbook and that he agreed to be bound by its terms. A copy of Copart's confidentiality policy and Defendant's acknowledgment thereof are attached hereto as Exhibits B and C, respectively.

16.     Further, Copart takes steps to protect the confidentiality of its pricing information on the supplier side. Copart's standard contract with its insurance company customers includes the following language:

Confidentiality: The Company acknowledges that certain procedures, information, and business methods of Copart disclosed pursuant to this Agreement are proprietary to Copart and trade secrets of Copart ("Trade Secrets"). Of particular and material importance and value to Copart are the terms of this Agreement. The companies agrees not to verbally, in print, or otherwise disseminate Copart's Trade Secrets in part or in whole to anyone outside of the Company unless required by a State regulatory agency, any legal proceeding, or for the purpose of establishing salvage value on Owner-Retained Vehicles.

17.     In his position as General Manager, Defendant was privy to the auction and service fees paid by the insurance carriers (*e.g.,* State Farm, Shelter Insurance, Progressive Insurance, and others) from which Copart draws many of its vehicles for auction. These fees are not published and not known to the public; rather, they are closely-guarded secrets. If a competitor knew Copart's fee arrangements with the insurance carriers and the services it provided for those fees, it could attempt to undercut Copart, which could result in massive lost revenues.

18.     In July of 2008, Copart learned that Defendant, while still employed as its General Manager, was entertaining employment opportunities with Sapulpa, a competitor with facilities in Oklahoma, Kansas, and Missouri. Sapulpa, like Copart, auctions off salvaged vehicles obtained from insurance carriers and other sources. Although it has no disclosed facility in Arkansas, Sapulpa was recently acquired by Manheim Total Resource Auctions ("Manheim"), a large auto remarketing competitor of Copart. According to its website, "Manheim Total Resource Auctions is a vehicle remarketing company specializing in salvage, damaged and inoperable vehicles. Total Resource Auctions are located at existing Manheim locations and at free-standing sites." *See* http://www.manheim.com/products/?dest=tra. Notably, Manheim maintains a facility in Arkansas at 2600 Lakewood Village Pl., N. Little Rock, Arkansas 72116.

19.    At the time Defendant resigned, he indicated he would be going to work for Sapulpa in Arkansas.   He informed a Copart representative that he would be working as Sapulpa's Government Affairs Director for the State of Arkansas.  For several reasons, Copart is not inclined to believe Defendant: (1) Sapulpa is not registered to do business in Arkansas; (2) Manheim does not have a registered lobbyist in Arkansas for 2008; and (3) the Arkansas Legislature meets only every other year.   Consequently, Copart has valid concerns that Defendant's work for Manheim will not be as a mere lobbyist, but rather will require him to draw upon his knowledge of confidential and proprietary Copart information.

20.    Following Defendant's resignation, Copart's attorneys exchanged letters with the attorneys for Defendant and Manheim regarding Defendant's contractual, statutory, and common law duties to Copart.   In their letters, the attorneys for Manheim and Defendant sought to reassure Copart that their clients were engaged in no wrongdoing, that Manheim had no designs on Copart's confidential information, and that Defendant would honor his obligations regarding Copart's trade secrets.

21.    However, Copart has recently been contacted by one of the insurance companies with which it frequently does business regarding Defendant's solicitation of such carrier's business.  Upon information and belief, Defendant is already using his knowledge of Copart's pricing structure to attempt to divert Copart business to Manheim and/or Sapulpa.

22.    Copart has been further informed that Defendant has been openly discussing the fact that he is actively soliciting Copart's existing insurance company customers, attempting to divert Copart business to Manheim and/or Sapulpa, and that he has convinced one insurance company to stop doing business with Copart and switch to Manheim and/or Sapulpa effective January 1, 2009.

23.    There is no doubt that Defendant would have had to use his knowledge of Copart's confidential fee structure, its relationship with the insurance carrier, and other confidential trade secret information when he attempted to convince these carriers to send their business to Sapulpa or Manheim.

24.    In addition, upon information and belief, Manheim and/or Sapulpa is acquiring or has recently acquired land near Copart's Conway facility.   Upon information and belief, Defendant has been tapped to manage a new auto remarketing facility on this property to be opened in January of 2009, in direct competition with Copart.

25.    Despite multiple requests Defendant, Manheim and Sapulpa refuse to disclose their intentions regarding Defendant's employment prospects.   Accordingly, based on the foregoing facts and upon information and belief, Defendant is engaging in or preparing to engage in unfair and unlawful competition with Copart, in violation of statutory law and common law.

## FIRST CAUSE OF ACTION

### Violation of the Arkansas Trade Secret Act

26.    Copart hereby incorporates preceding paragraphs of this Complaint as if fully set forth herein.

27.    By the foregoing actions, Defendant has violated the provisions of the Arkansas Trade Secrets Act, Ark. Code Ann. § 4-75-601, *et seq.*

28.    The sales and service fees Copart charges its customers constitute Copart's trade secrets.   Further, Copart's inside knowledge regarding its customers' and buyers' selling/buying practices, operational methods, and profit margins constitute trade secrets.

29.     These trade secrets give Copart a significant advantage over its existing and would-be competitors, an advantage that would be lost if the trade secrets became known to the public or to Copart's competitors, including Manheim or Sapulpa.

30.     Copart has made reasonable efforts under the circumstances to preserve the confidentiality of its trade secrets.  Copart's trade secrets derive independent economic value from not being generally known to the public or to other persons who can obtain economic value from their disclosure.

31.     Defendant is under a continuing duty to keep Copart's trade secrets confidential and to prevent such information from being obtained by individuals outside of Copart.

32.     Defendant has inevitably used Copart's trade secrets in his solicitation of one or more insurance carriers on behalf of Sapulpa and/or Manheim.  Defendant, therefore, has already misappropriated Copart's trade secrets for his own gain without regard to Copart's rights and without compensation, permission, or license.

33.     Copart does not have an adequate remedy at law and has been damaged by Defendant's violation of the Arkansas Trade Secrets Act and will continue to be damaged absent injunctive relief prohibiting him from future or continuing violations.

34.     Defendant has been, and will continue to be, unjustly enriched by virtue of his misappropriation of Copart's trade secrets and violation of the Arkansas Trade Secrets Act.

35.     Defendant's conduct was, is, and remains willful and wanton and was taken with blatant disregard for Copart's valid and enforceable rights.

## SECOND CAUSE OF ACTION

<u>Violation of Common Law Trade Secrets</u>

36.     Copart hereby incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

37.     Defendant's actions render him liable for the common law misappropriation of Copart's proprietary information and trade secrets for which Copart is entitled to injunctive relief and damages.

### THIRD CAUSE OF ACTION

Inevitable Disclosure of Trade Secret Information

38.     Copart hereby incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

39.     By virtue of his position with Copart, Defendant owes Copart the duty to refrain from disclosing or exploiting trade secrets, know-how, and confidential and proprietary information belonging to Copart, for his own benefit, for the benefit of a competitor, or to the detriment of Copart.

40.     Because of the specialized confidential information and knowledge which Defendant received and/or had access to while working for Copart, and because Defendant has taken a job with Sapulpa and/or Manheim that appears to be similar in job functions as to those he discharged while working for Copart, it is inevitable that Defendant will breach the above duties, and will disclose, exploit, and misuse Copart's trade secrets in his work on behalf of Sapulpa and/or Manheim.

41.     As a direct and proximate cause of Defendant's misconduct, Copart has been greatly damaged.  Copart will suffer irreparable harm as a result of Defendant's conduct which cannot be adequately redressed at law, unless Defendant and all those acting in concert and participation with him are enjoined from engaging in any such conduct.

42.    In the event it is determined that it is necessary to add additional party defendants for any injunctive relief to provide the intended relief obtained herein, Copart reserves the right to further amend this Complaint to seek whatever relief is appropriate in the circumstances, including but not limited to a reasonable reassignment of job duties.

## FOURTH CAUSE OF ACTION

Tortious Interference With Contract And Prospective Business Relations

43.    Copart incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

44.    Copart possessed valid contracts with customers, including the insurance carriers with which it does business, for the provision of remarketing services.

45.    Defendant has knowledge of Copart's contracts and relationships with these customers as a result of his employment as a General Manager for Copart.

46.    By diverting or attempting to divert existing Copart customers to its competitors, Defendant willfully and intentionally committed acts that were calculated and did cause interference with Copart's contract with one or more insurance carriers or customers.

47.    In diverting or attempting to divert existing Copart customers to its competitors, Defendant used Copart's confidential and trade secret information to gain an unfair advantage.

48.    In addition and/or in the alternative, Defendant's willful, intentional, and wrongful diversion or attempted diversion of Copart's customer to a competitor has damaged future contractual relations between Copart and its existing and prospective business relationships with one or more insurance carriers or customers. If not for such acts, a reasonable probability exists that Copart would have entered into additional agreements with one or more insurance carriers or customers.

49.     Defendant lacked justification in committing these acts.

50.     Defendant has willfully and intentionally interfered with Copart's contracts and/or prospective business relations. Such interference was the proximate cause of non-economic and actual economic damage and loss to Copart in an amount that has not yet been determined.

51.     Because Defendant's conduct is willful, intentional and done with malice, Copart seeks punitive damages against Defendant to deter such conduct in the future.

52.     Defendant's intentional interference has caused and threatens to continue to cause multiple forms of harm to Copart that are both reparable and irreparable in nature.

53.     By the unlawful conduct of Defendant, Copart has suffered and continues to suffer immediate, imminent, and irreparable harm that cannot be adequately compensated by an award of damages, including, without limitation, loss of established and prospective customer relationships that it has developed at great expense over a long period of time. Defendant's actions are in clear breach of his common law obligations, providing Copart with a probable right of relief. Unless enjoined, Defendant's intentional conduct will continue to cause irreparable harm to Copart for which there exists no adequate remedy at law.

## FIFTH CAUSE OF ACTION

### Breach of Contract-Confidentiality Policy

54.     Copart hereby incorporates the preceding paragraphs of this Complaint as if fully set forth herein.

55.     By using Copart's confidential information and trade secrets in the course of the performance of his duties for Sapulpa and/or Manheim and in the solicitation of Copart's customers, Defendant has unjustifiably and inexcusably breached, and continues to be in breach

of, his contractual or quasi-contractual obligations under the confidentiality policy contained in Defendant's employee handbooks.

56.     As a direct and proximate result of the breach of contract by Defendant, Copart has been greatly damaged. Defendant's breach of his contractual confidentiality obligations will result in irreparable harm and damage to Copart's proprietary and confidential business information.

57.     Copart has no adequate remedy at law for the irreparable harm caused by Defendant's breach of contract, unless Defendant, and all those acting in active concert or participation with him, are enjoined from engaging in any further breaches of contract.

## PRAYER FOR RELIEF

WHEREFORE, Copart requests that the Court award it the following relief:

a.     A preliminary injunction directing Defendant and all persons in active concert or participation with Defendant to cease and desist from (a) disclosing to any other person or company, or using for Defendant's own personal benefit, any confidential information disclosed to Defendant or of which Defendant became aware by reason of his employment or association with Copart and (b) using Copart's trade secret protected and/or confidential information to solicit, divert, take away, or attempt to solicit, divert or take away, any customer or encourage any customer of Copart to cease or reduce its business with Copart until such time as this matter is finally concluded;

b.     A permanent injunction directing Defendant and all persons in active concert or participation with Defendant to cease and desist from (a) disclosing to any other person or company, or using for Defendant's own personal benefit, any confidential information disclosed to Defendant or of which Defendant became aware by reason of his employment or

association with Copart and (b) using Copart's trade secret protected and/or confidential information to solicit, divert, take away, or attempt to solicit, divert or take away, any customer or encourage any customer of Copart to cease or reduce its business with Copart;

        c.      Injunctive relief which assures that any future misappropriation of Copart's confidential information and trade secrets be immediately stopped on the part of the Defendant and other persons acting in active concert or participation with him;

        d.      Further equitable relief in the most appropriate form that will have the effect of "undoing" any past and current misappropriations of Copart's confidential information and trade secrets by the Defendant or any persons acting in active concert or participation with him;

        e.      Specific performance of the contracts Defendant entered with Plaintiff;

        f.      An accounting to establish, and an order requiring the disgorgement of, the sums by which Defendant has been unjustly enriched;

        g.      Compensatory damages, past and future, in an amount adequate to compensate Copart;

        h.      Pre-judgment and post-judgment interest at the maximum rate allowed by law;

        i.      Attorney fees and costs incurred by virtue of this action; and

        j.      Such other relief, in law or equity, as the Court may deem just and appropriate in the circumstances.

Respectfully submitted,

Eva C. Madison (98183)
R. Scott Summers (2006102)
Littler Mendelson, P.C.
3739 Steele Blvd., Suite 300
Fayetteville, Arkansas 72703
Telephone: 479-582-6100
Fax:  479-582-6111
emadison@littler.com

**ATTORNEYS FOR PLAINTIFF**